HILL RIVKINS & HAYDEN LLP
*Attorneys for Plaintiff*
45 Broadway, Suite 1500
New York, New York 10006
Tel: (212) 669-0600
Fax: (212) 669-0699

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTRADE SHIPPING & TRANSPORT, GmbH | Index No.: 08 CV 1304(GBD) |
| Plaintiff, | **CERTIFICATION OF RICHARD VERNEY** |
| vs. | |
| SASCO GmbH, | |
| Defendant. | |

I Richard Verney, hereby certify as follows:

1.    I am associate with the law firm Winter Scott with offices in London.  We are counsel for the plaintiff Martrade Shipping & Transport GmbH ("Martrade") with regard to disputes with the defendant SASCO GmbH.

2.    More specifically, I represented Martrade in an arbitration against Sasco GmbH conducted before the London Maritime Arbitration Association, in accordance with the contract between the parties.  Attached hereto as Exhibit 1 is a true and correct copy of the Claimant's Submission of Claim in the arbitration, with "Enclosure 1" which is a Fixture Recap setting forth the terms of the charter party.  The Fixture Recap is based upon a Gencon 94 standard charter party, with logical amendments, and is between Plaintiff Martrade Shipping & Transport GmbH,

as disponent owners of the M/V Capt. George Tsangaris, and Sasco GmbH, as charterer, dated November 25, 2005.

3.    A true and correct copy of the Gencon 94 standard terms is attached as Exhibit 2, which, by way of reference in the Fixture Recap and by virtue of Box 25 and Clause 19(a), contains the parties' agreement to arbitrate any dispute in London with English law to apply.

4.    Attached as Exhibit 3 is a true and correct copy of the Respondent Sasco GmbH's Submissions of Defence in the arbitration, in which it does not take point with respect to the agreement to arbitrate.

5.    Attached hereto as Exhibit 4 is a true and correct copy of the Arbitration Award in favor of Martrade and against Sasco GmbH rendered on September 14, 2007 by the sole arbitrator Mr. David Farrington, which has not been appealed or overturned.

I hereby certify under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:  London, England, UK
24th June , 2008

_____
Richard Verney

2

# Winter Scott
Solicitors

19-21 Great Tower Street
London EC3R 5AR
Telephone: + 44 (0)20 7648 2460
Fax: + 44 (0)20 7626 5591
DX: 518 London/City
E-mail: firstinitialsurname@winterscott.co.uk

David Farrington                      Our Ref:          RJV/kr/63/33
Chorley Farm House                    Your Ref:
West Wycombe
Buckinghamshire
HP14 4BS

Date:             18 December 2006

Dear Mr Farrington,

Re:   Capt George Tsangaris c/p dd 25/11/05 – stevedore damage at Odessa

We write in connection with the above captioned matter in which we represent the Claimant Owners, Messrs Martrade Shipping & Transport GmbH. The Respondent Charterers, Messrs Sasco GmbH, are unrepresented. We would appreciate the Tribunal treating this letter as Claimant's Submissions of Claim.

1.    By way of a charterparty on amended Gencon 1994 Form dated 25th November 2005, the Claimant as Disponent Owners, chartered their vessel m.v "CAPT. GEORGE TSANGARIS" to Sasco GmbH for one voyage carrying a part cargo of steel billets from Odessa to Karachi.

2.    The Claimant relies upon the full terms and provisions of the charterparty. The charterparty although performed has not been drawn up and the Claimant attaches a copy of the fixture recap (which sets out the terms of the charterparty) as enclosure 1. The charterparty provides, inter alia, the following:

      *"Freight 43.50 US Doll. – Mtons Free In..."*

      *"Cargo to be loaded/dunnage/stowed/lashed/secured by Shippers stevedores free of expense to the vessel"*

      *"stevedores damages, if any, to be settled directly between owners and stevedores w/out chrts interference. In case owners are unable to get such settlement, chrts to by all means assist in getting this settlement and remain ultimately responsible".*

      *"owise detention to apply at the rate of US$35,000, – day/rata..."*

Partners: Glenn Winter  Ken Scott  Michael Ellis  Damian Wilkes  Tim Houghton
Associates: Richard Verney (not admitted)  James King
Regulated by the Law Society

VAT No GB 819417416



3.   As noted in paragraph 1, the Claimant are Disponent Owners having charterered in the performing vessel at a daily hire rate of US$24,000 pdpr pursuant to a charterparty on amended NYPE 1946 terms, a copy of which is attached as enclosure 2.

4 (a)  Pursuant to the terms of the referenced charter, the vessel loaded a cargo of steel billets at Odessa.

  (b)  On or about 12th December 2005, towards the end of loading, a bundle of steel billets was dropped damaging and puncturing the port side tank top in hold no.7. The damage penetrated into no.4 fuel oil tank. We attach, as enclosure 3, a copy of the stevedore damage report issued by the Chief Officer (on behalf of the vessel).

  (c)  The dropping of the bundle of billets was caused by the negligence of the stevedores who had been employed by or on behalf of the Respondent. We attach, as enclosure 4, a copy of a notice addressed *"to whom it may concern"* issued by the Respondents in which they confirm *"Its very clear that the damage was caused from stevedores negligence and therefore we have no alternative than to hold them fully responsible for all the eventual consequences which they might follow from our side...."*

5. (a)  Loading of Respondent's cargo was subsequently completed on 12th December.

  (b)  The vessel completed loading other cargo, not for the account of the Respondent, at 17:30 hrs on 15th December and but for the damage to the vessel, the vessel would have sailed at about this time.

  (c)  However, as a consequence of the damage, the vessel's sailing from Odessa was delayed.

  (d)  Repairs were effected to the vessel, by stevedores, between 17:30 hrs 15th December through to 23:00 hrs on 18th December. We attach as enclosure 5, a copy of the Port Statement of Facts confirming the above.

6. (a)  Pursuant to the above, the Claimant is not claiming for the costs of the physical repair since the physical repair was effected by the stevedores at their expense.

  (b)  However, the vessel was delayed between 12th and 19th December as per the detention invoice, a copy of which is set out as enclosure 6, and the Claimant's claim is for the loss of time spent repairing the damage.

  (c)  The Claimant claim detention up to 15th December at the rate of US$35,000 pdpr as provided by the charterparty as the detention rate. As from 15th December, the Claimant claims detention at the rate of US$27,500 pdpr being the daily hire rate paid by the Claimants to Head Owners plus the daily running costs of the vessel (eg., bunkers, CVE, insurance, port expenses etc).

7. (a)  The Claimant has tried to obtain reimbursement of the time lost directly from the stevedores but without success. The Claimant has appointed local Ukranian lawyers to contact the stevedores threatening legal proceedings but even this has not

2

encouraged the stevedores to settle the claim. The Claimant even set up a meeting to be attended by the stevedores and a representative of the Respondent with a view to promoting a settlement but the Respondent's representative did not show up and the meeting did not produce a settlement. To the extent that this may be necessary, the Claimant will rely upon this as a breach by the Respondent of their agreement "...*chrts to by all means assist in getting this settlement...*" The Claimant has no contract with the stevedores and the stevedores have declined to settle the detention losses.

(b) Pursuant to the terms of the charter (Part II Clause 5(b) of Gencon 1994 and the specific terms set out in paragraph 2 above), the Respondent is liable to reimburse the Claimant with respect to the loss.

(c) It is settled law that a provision reading "*stevedores damages, if any, to be settled directly between owners and stevedores w/out chrts interference. In case owners are unable to get such settlement, chrts to by all means assist in getting this settlement and remain ultimately responsible*" merely requires Owners to use reasonable endeavours to recover from the stevedores. If the stevedores do not settle the claim then the Charterers are liable (pursuant to their agreement to their obligation to load the vessel on free in terms and their agreement to "...*remain ultimately responsible*" for damage caused by stevedores. We attach, as **enclosure 7**, a copy of London Arbitration 4/87 report in LMLN 188.

Pursuant to the above, the Claimant claims:

(i) US$115,955.53, alternatively damages; and
(ii) Interest at a commercial rate and compounded at such intervals as the Tribunal may assess;
(iii) Costs

The respondent is hereby requested to serve their Submissions of Defence within the next 28 days.

Yours faithfully,

WINTER SCOTT

Enc.

c.c.    Sasco GmbH

3



# Enclosure 1
## To the Claimants' Submissions of Claim
## Dated 18th December 2006



Doc-No. 1974819  25/NOV/2005  15:03 (UTC +0100) TMS

jim/thomas

tks yrs. regretfully recap is still not as agreed and th4
ammend that deadfreight and detention to be paid within 5 bdays
and not 7 bdays

moreover pls specificaly mention that all subs lifted and we are
clean fixed

brgds
martrade/thomas mais


------------Original message--------------
From :    "Seavent Maritime" <seavent@otenet.gr>
To :      sales@martrade-shipping.de
Date   :  Fri, 25 Nov 2005 15:08:23 +0200
Subject : C.G.TSANGARIS/SASCO ODESSA-J.ALI+KARACHI/clean fix recap


SEAVENT MARITIME SA
TEL:+30210-4521739/4521189
FAX:+30210-4521096
E-MAIL:seavent@otenet.gr
---------------------------------
Thomas / jim

just when i thought that all our problems were solved!!


chrts hve recvd foll fm port authorities

qte
"Odessa port Authorities and Novotech terminal hereby confirm acceptance of
M/v
Captain George Tsangaris w/i laycan 06-12.12.05 in accordance with confirm
berthing
schedule"
unqte

ofc chtrs are trying their best to convince port and get acceptance fm the
3rd of dec.in
wld appreciate if you could push fm yr end as well.

furthermore there are 2 alterations on the recap
just to save you fm the trouble of checking each sentence alterations as
foll

-29nov-9dec laycan (trust you can accept same since it does not affect the
cancelling)
-hve deleted fm the detention wording "in view of missing cgo".


M/V "CAPTAIN GEORGE TSANGARIS"

PART 1:
-------

 1. NAME/EX-NAME/TYPE OF VESSEL:M/V  ''CAPTAIN GEORGE TSANGARIS''
    EX  WORLD JADE  - BULKCARRIER
 2. DWAT METRIC TONS SUMMER/WINTER/FRESHWATER ALLOWANCE:
    ALSO THE FOLL DWAT TO BE ADVD:
    FULL SUMMER D/W  : 61,346 M.T./DRAFT 13.02 MTRS/ TPC  61,69 MT
    FULL WINTER D/W  : 59,675 M.T./DRAFT 12.75 MTRS/ TPC  61,35 MT



```
        FULL TROPICAL D/W : 62,992 M.T./DRAFT 13.29 MTRS/ TPC  62.00 MT
        FULL FR/WATER D/W : 61,365 M.T./DRAFT 13.32 MTRS/ TPC  61.50 MT
        FRESH WATER ALLOW.: 0.297 MTRS.
        - DWAT ON  7,6 MTRS FW   : 28145
        - DWAT ON  7,9 MTRS FW   : 29830
        - DWAT ON  9,5 MTRS FW.  : 38905
 3. DRAFT SUMMER / WINTER  (SEE NO. 2 )
 4. FLAG:  PANAMA
 5. PORT OF REGISTRY: PANAMA     REGISTRATION NO.:18775-90-CH
 6. WHERE/WHEN (YEAR/ MONTH) VESSEL WAS BUILT:
    KOYO DOCKYARD CO. LTD   MIHARA   JAPAN  /  FEBR. 1982
 7. L.O.A.: 223 MTRS       L.B.P.: 213.00  MTRS
 8. EXTREME BREADTH:    32.20 MTRS
 9. DEPTH MOULDED:     17.90 MTRS
10. TPC (MT) SUMMER/WINTER:  (SEE  NO. 2 )
11. INTERNATIONAL GRT/NRT: 34211 / 19710
    SUEZ CANAL TONNAGE GROSS/NETT: 34409.85 / 29956.90
    PANAMA CANAL TONNAGE GROSS/NETT 35679.02 / 27097.84
12. NAME AND NATIONALITY OF MASTER/NATIONALITY OF CREW:
    CAPT.  GREGORY  VARGAS  FILIPINO / FILIPINOS
13. P AND I CLUB:  WEST OF  ENGLAND
14. HULL AND MACHINERY VALUE FOR INSURANCE PURPOSES IN USD:
    7.000.000  +  1.750.000  I.V.
15. CLASSIFICATION INCL NOTATION SOCIETY/CLASS:
    +100 A1 LMC  UMS    BULKCARRIER STRENGHTHENED FOR HEAVY
    CARGOES (HOLDS NOS  2 - 4 - 6  MAY BE EMPTIES)
    CLASSIFICATION COMPANY : L.R.S. NO. 8100959
    VESSEL EQUIPPED/CERTIFIED ACCORDING TO B/C CODE APPENDIX 'B':
16. CUBIC BREAKDOWN OF ALL COMPARTMENTS GRAIN/BALE:
    CUBIC BREAKDOWN BY HOLDS ( CBM AND CBF +  GRAIN AND BALE)
               G R A I N                 B A L E
    HOLD NO.     C B M     C B F      C B M     C B F
    --------------------------------------------------------------
    NO. 1        8638.5   305068     8396.2    296511
    NO. 2       10381.7   366626    10167.8    359072
    NO. 3       10682.1   377234    10457.7    369310
    NO. 4        9087.2   320911     8891.1    313986
    NO. 5       10710.5   378237    10486.1    370313
    NO. 6       10710.2   378227    10485.4    370288
    NO. 7       10005.5   353341     9818.9    346751
    --------------------------------------------------------------
    T O T A L   70215.7  2479641    68703.2   2426229
17. NUMBER OF DERRICKS/CRANES CAPACITY S.W.L.: 15 M/T
    OUTREACH OF CRANES:  FROM  SHIPSIDE   5.9 MTRS AT 25 DEGR.
    LOCATION OF CRANES: CARGO HOLDS  1/2  2/3  3/4  4/5  5/6  6/7
    HOISTING SPEED OF CRANES: 15 M/MIN
    CRANE CYCLES PER HOUR:  1.2  MIN.
    GRAB FITTED:   N O
18. NUMBER OF HOLDS INCL.CLEAR UNOBSTRUCTED DIMENSIONS (LENGTH X
    BREADTH ) ON FLAT TANKTOP AND DIMENSIONS OVERALL AND HEIGHT IN
    HOLDS TO UNDER DECK AS WELL AS HATCHCOVER:
    ARE THERE ANY SLOPES/HOPPERS:YES
    A. HOLD DIMENSIONS BOTH GRAIN AND BALE.
                      G R A I N               B A L E
    --------------------------------------------------------------
    NO.1 HOLD (MAX)  23.00 X 29.20  M       22.60 X 28.40 M
    NO.2 HOLD (MAX)  23.70 X 31.40          21.90 X 29.60
    NO.3 HOLD (MAX)  24.10 X 31.40          22.40 X 29.60
    NO.4 HOLD (MAX)  21.10 X 31.40          19.30 X 29.60
    NO.5 HOLD (MAX)  24.20 X 31.40          22.40 X 29.60
    NO.6 HOLD (MAX)  24.60 X 31.40          22.80 X 29.60
    NO.7 HOLD (MAX)  24.30 X 29.60          23.50 X 28.80
    B . TANKTOP: DIMENSION (FORWARD AND AFT HOLD BEAM  AND LENGTH.)
       NO.1 HOLD   F.B.10.70 M   A.B. 21.30   L = 20.30 M
       NO.2  ''    F.B.22.00 M   A.B. 25.20   L = 20.70 M
       NO.3  ''    F AND A  20.20 X 25.30  M
       NO.4  ''    F AND A  16.20 X 25.30  M
```

*(6)*

```
              NO.5  ''    F AND A  20.30 X 25.30  M
              NO.6  ''    F AND A  21.30 X 25.30  M
              NO.7  ''    F.B.22.40 M    A.B.13.30M   L = 23.40 M

    C.  HEIGHT TANK TOP TO  UNDER DECK  15.80 MTRS
        HEIGHT TANK TOP TO  HATCH COVER 19.05 MTRS
19. NUMBER OF HATCHES AND DIMENSIONS:
    HATCH COVER TYPE: NO1 FOLD. TYPE, ALL OTHERS SIDE SHIFTING TYPE
    HATCH SIZES :
    NO.1   14.000X12.8 M
    NO.2   17.000 X 12.8 M
    NO.3   17.115 X 12.8 M
    NO.4   13.855 X 12.8 M
    NO.5   17.115 X 12.8 M
    NO.6   17.115 X 12.8 M
    NO.7   15.485 X 12.8 M

    WORKABLE LENGTH BETWEEN FORE-PART OF 1ST AND AFT-PART LAST
    HATCH:  160.80  MTRS
20. STRENGTH ON TANKTOP/WEATHERDECK/HATCHCOVERS PER SQM :
    A. TANKTOP STRENGTH IN HOLDS:
       HOLDS NO. 1-3-5-7: 23.18  MT/M2, HOLDS NO.2-4-6: 18.40 MT/M2
    B. HEAVY CARGOES MAXIMUM INTAKE PER HOLD IN MTS.
       AS PER TANKTOP STRENGTHS:
        1/7529  2/8988  3/11846  4/7541 5/11905   6/9915   7/9682
    C. DECK AND HATCH COVER STRENGTH. DECK: 1.79  MT/M2
                            H.COVER : N I L

    ALTERNATE HOLDS LOADING: YES

21. HOLDS/HATCHES/WEATHERDECK SPACE WITHOUT ANY OBSTACLES: N/A
22. ARE VESSEL'S HOLDS/TWEENDECKS FREE OF ANY OBSTRUCTIONS : YES
    PLS ADV IF ANY GIRDER OR CENTERLINE BULKHEAD:  NO
23. TYPE OF HATCHCOVERS WEATHERDECK/TWEENDECK:
    HATCH COVER TYPE: NO1 FOLD. TYPE, ALL OTHERS SIDE SHIFTING TYPE

24. SUEZ CANAL/PANAMA CANAL :  YES
25. ICE-STRENGTHENED/ICE CLASS:  NO
26. VSL FTD WITH VHF RADIO AND RADIO EQUIPMENT G M D S S (GLOBAL
    MARINE DISTRESS + SAFETY SYSTEM AS PER SOLAS CHAPTER IV):  YES
27. VSLS IMO REGISTRATION NUMBER:  8100959
28. IS VESSEL SUITABLE FOR GRAB DISCHARGE:  YES
29. IS VESSEL GRAINFITTED:  YES
30. IS VESSEL ITF APPROVED:  YES
31. CO2 FITTED IN HOLDS:  YES
32. PERMANENT/COLLAPSIBLE STANCHIONS ON DECK:  YES
33. IS VESSEL LOGSFITTED (INCL CHAINES/WIRE/TURNBUCKLES/SLIP
    HOOKS):  N O

PART 2:
-------

 1. SPEED LOADED:
 2. SPEED BALLAST:
 3. TYPE OF BUNKERS:
 4. CONSUMPTION:
    A) AT SEA
    B) IN PORT IDLE/GEAR WORKING PER 24 HOURS

    1-2-3 AND  4  AS  PER  T/C  DESCRIPTION.

ABT 13KN ON ABT 31 LT (L) 27.5(B)(IFO 180 CST RME25)+2.5MDO(DMC)
ABT 14KN ON ABT 36.5 LT (L) 29.5(B)(IFO 180 CST RME25)+2.5MDO(DMC)
PORT CONS: ABT  2.5 LT MDO (GEAR IDLE PER 24 HRS)
         : ABT  3.0 LT MDO + 2.0 LT IFO (PER 24 HOURS GEAR WORKING)
SERVICE SPEED IS BSS GOOD WEATHER CONDITIONS AND UP TO BEAUFORT FORCE 4
(CALCULATION OF VESSELS PERFORMANCE ON BOTH LADEN AND BALLAST PASSAGES
HAS
```



TO BE BASED UPON AN AVERAGE SPEED/ CONSUMPTION DURING WEATHER DAYS UPTO
BEAUFORT 4 AND/OR DOUGLAS SEA STATE 3,AND NO ADVERSE CURRENTS. LADEN OR
BALLAST SPEED AND CONSUMPTION FOR PERIOD OF WEATHER IN XSS OF BEAUFORT 4
AND
OR DOUGLAS SEASTATE 3 IS TO BE EXPRESSLY EXCLUDED FROM CALCULATIONS.
OWNERS
LIBERTY TO USE MDO FOR MANOUVERING AND IN CONFINED/ RESTRICTED WATERWAYS
AND
IN COLD WEATHER FOR BOILER/ HEATING.
ALL DETS GIVEN IN GOOD FAITH, ABT


  5. FUEL CAPACITY OF BUNKERS IN METRICTONS:
     IFO:  3280  M3    MDO:  246  M3
  6. CONSTANTS INCLUDING UNPUMPABLE BALLAST WATER MAX BUT EXCL
     FW:  500  T.
  7. FRESHWATER ON DELIVERY MAX:  150 TONS
  8. FRESHWATER EVAPORATOR INCL DAILY PRODUCTION:  15 TONS
  9. NAME/DOMICILE OF ORIGINAL OWNERS:
     REMO  ENTERPRISES  INC. OF  MONROVIA
     NAME OF INDIVIDUAL: CAPT. G. SPITHOYIANNIS
     C/O  TSANGARIS  BROS  LTD
     ADDRESS:46  FILONOS  STR. PIRAEUS  GREEECE
     PHONE: +30 210 4221515  FAX: +30 210 4221514
     TELEX: 241239  GR
     COMTEXT E-MAIL:  N/A
     INTERNET E-MAIL: tsangbro@otenet.gr
     CABLE ADDRESS:   N/A
 10. NAME/DOMICILE OF VESSEL'S MANAGERS:
     TSANGARIS  BROS  LTD
     NAME OF INDIVIDUAL:  SEE  ITEM NO. 9.


 11. NAME/DOMICILE OF VESSEL'S DISPONENT OWNERS (IF ANY): N/A

 12. VESSELS CALL SIGN: 3 F A G 7
 13. RADIO STATION FOR COMMUNICATIONS WITH VESSEL: N/A
     VESSEL'S INMARSAT/TELEX/FAX/TELEPHONE NOS: INMARSAT A.
     1360664 /1360665 /1360664 AND INMARSAT C TELEX 435471410.
 14. HULL UNDERWRITERS: DEX  OF  LONDON  FOLLOW  BY  OTHERS
 15. NUMBER OF U.S. POLLUTION CERTIFICATE: 825475-04
 16. ELECTRIC VENTILATION:
     AIRCHANGES/HOUR BSS EMPTY HOLDS:  N/A
 17. DOES VESSEL HAVE GYRO COMPASS/SATELLITE NAVIGATION:  YES
 18. LAST THREE CARGOES/CHRTRS:
     COAL / TAHO  TAIPEI - COAL / ARPENI JAKARTA - COAL / ARPENI
 19. LAST DRYDOCK: FEBR/2004 -  LAST SPECIAL SURVEY: FEBR.2002
 20. LIGHT WEIGHT OF VESSEL:  12.040
 21. AIRDRAFT:  DISTANCE  KEEL TO  HIGHEST POINT  OF MAST  45,85 MTRS
 22. MAX DISTANCE BTW TOP OF HATCHCOAMING AND WATERLINE IN BALLAST
     CONDITION (EXCL ANY HOLDFLOODING): C/H1- 17.15/C/H 7 - 15.90 MTRS
 23. ACCOMODATION LADDER FTD:  AFT
 24. ARE THERE ANY LIMITATIONS FOR LOADING OF HEAVY COILS IN
     VESSEL'S LOADING MANUAL:  NO
     IF YES, PLS ADV WHICH LIMITATIONS:N/A
 25. OTHER SPECS TO BE MENTIONED IF ANY:  N/A
 26. OWNERS BROKER THROUGH WHOM CORRESPONDENCE IS TO BE EFFECTED:  N/A

     FULL ADDRESS:
     PHONE:         FAX:          TELEX:
 27. DETENTION BY PORT STATE CONTROL DURING LAST 12 MONTH:  NO
 28. IF YES, PLEASE STATE IN DETAILS OF INCIDENT/ACCIDENT/NATURE OF
     PSC DETENTION OBSTRUCTING VSLS CLASSIFICATION:  N/A
 29. VSL FREE FROM OF ANY ENCUMBRANCES A/O ANY MARITIME LIEN:  YES
 30. VESSEL IS FINANCED BY MORTAGEE BANK MESSRS.   N/A
 31. MORTGAGED AMOUNT USD:          DATE:          N/A
 32. NAME/FULL STYLE OF MORTGAGOR:                 N/A
 33. PLEASE CONFIRM THAT THE OWNERS/MORTGAGOR HAS COMPLIED FULLY



```
          WITH ALL TERMS OF MORTGAGE AGREEMENT WHILST TRADING UNDER THIS
          C/P:     N/A
34. FULL BANKING DTLS OF OWS FOR REMITTANCE OF HIRE:  AS  PER  C/P
35. VESSEL'S G/A PLAN AND FOLLOWING VALID CERTIFICATES TO BE
      FAXED/MAILED TO CHARTERERS MESSRS. MARTRADE SHIPPING+TRANSPORT
      GMBH - AM WEHRHAHN 45 - 40211 DUESSELDROF - GERMANY AS
      FOLLOWS:
       WILL BE  FAXED  THE  CERTIFICATES  TODAY.
all details abt and wog




FOR
-ACCT SASCO GMBH
-5.000 mtons words novotech terminal , Odessa port +/- 3 % chopt
     470 mtons plates at novolog terminal Odessa port +/-3 % chopt
     200 mt of steel plates novolog terminal , Odessa +/- 3% chopt
-L/P 1 gspsb aaaa ODESSA
-D/P 1 gspsb aaaa JEBEL ALI, OWNS TO SATISFY THEMSELVES WITH PORT
RESTRCTIONS
BENDS
- L/C 29 November 2005 - 9 December 2005
- L/D CQD / LINER OUT (L/S/D)
- FREIGHT 43,50 US DOLL.-MTONS FREE IN LSD-LINER OUT
+
-4996 mt steel billets bare and loose
- 2992 mt steel billets bare and losse ,
- 4994 mt steel billets bare and loose some in bundles 10 mt max
- 420 mt steel billets bare and loose some in bundles 10 mt max
--------------
13.402 mtons billets in bundles and bare and loose +/- 3 % chopt
-------
Some cargo will be sitting in wagons at the time of loading
-L/P  1 gspsb aaaa ODESSA at novotech terminal
-D/P 1 gspsb aaaa KARACHI, OWNS TO SATISFY THEMSELVES WITH PORT
RESTRCTIONS
BENDS
- L/C 29 November 2005 - 9 December 2005
- L/D CQD / LINER OUT (L/S/D)
- FREIGHT 38.00 US DOLL.-MTONS FREE IN LSD-LINER OUT

- CARGO TO BE LOADED /DUNNAGE / STOWED/ LASHED /SECURED BY SHIPPERS
STEVEDORES FREE OF EXPENSE TO THE VESSEL

-PERFORMING VESSEL TO BE A1 HIGHEST CLASSIFICATION SOCIETY, ISM
  CERTIFICATES AND ALL CERTIFICATES FULLY P+I COVERED.
-100% OF FREIGHT  FULLY PAYABLE INTO OWNERS NOMINATED BANK ACCOUNT
WITHIN 3 BANKING DAYS AFTER S\R M\RS. 100% DEAD FREIGHT/DETENTION FULLY
PAYABLE INTO OWNERS NOMINATED BANK ACCOUNT WITHIN 7 BANKING DAYS AFTER S/R
M/Rs AND CONFIRMATION OF CALCULATION SOF AT LOAD PORT . CLEAN ON BOARD AND
FREIGHT PREPAID B\LS TO BE ISSUED AND RELEASED STRICTLY AS PER THE WORDINGS
OF LETTER OF CREDIT IN KIEV BY SASCO GMBH OR ULTRATEST SYSTEM LT D, UK /
AGAINST CHRTRS SINGLE LOI IN OWNERS WORDING AND RELEASED AGAINST SWIFT COPY
CONFIRMING THAT FRT HAS BEEN IRREVOCABLY REMITTED.BSL TO BE DATED LATEST
30.11.05 AGAINST CHRTRS SINGLE LOI IN OWS WORDING


FREIGHT DEEMED EARNED ON COMPLETION OF
LOADING AND NOT RETURNABLE DISCOUNTLESS WETHER VESSEL AND OR CARGO LOST
OR
NOT LOST.
PART CARGO IS ALLOWED,
TRANSHIPMENT IS NOT ALLOWED.
- OWNERS AGENTS BENDS.
ANY TAXES DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS ACCOUNT.
ANY TAXES DUES ON VESSEL, FLAG, CREW TO BE FOR OWNERS ACCT.
  - NOR  TO BE TENDERED ON ARRIVAL LOADING PORT TO THE OFFICIAL PORT
```



LIMITS.
BSS W/W/W/W VIA FAX/TELEX /VHF
- cqd loading.
  chrtrs to guarantee that on vsls arrival sh/orders for
  100pct jebel ali cargo are issued/released and delivered
  to the stevedores
  chrtrs to guarantee that on vsls arrival sh/orders for
  9.000 mtons karachi cargo to be issued and the blce sh/orders
  upto final qtty to be issued/released and delivered to the stevedores
  max. 30 hrs after vsls arrival
  owise detention to apply at the rate of usd 35.000,-- day/rata
  moreover detention to apply in case of any other delay vsl is suffering
  in view of missing cargo docx.
- ARBITRATION/GA IN LONDON ENGLISH LAW TO APPLY /Y ANTWRP 94 RULES TO
APPLY
-C/P BILL OF LADING TO BE ISSUED.
- CHARTERERS CAN DISCHARGE CARGO WITHOUT PRESENTATION OF THE ORIGINALS
BILLS OF LADINGS AGAINST LOI AS PER P+I CLUB WORDING.
- VESSEL TO BE A1 HIGHEST CLASSIFICATION SOCIETY, ISM
CERTIFICATES AND ALL CERTIFICATES IN ORDER FULLY P+I COVERED.
  - NO B\LS TO BE ISSUED WITHOUT OWNERS PRIOR APPROVAL
  - OWNERS TO ISSUE CERTICATES AS REQUESTED BY CHRTRS THAT VSL IS
  COVERED UNDER INSTITUTE CLASSIFICATION CLAUSE ETC.
- CONGENBILL 94 B\L PROFORMA TO BE USED
  OWNERS TO KEEP CHRTRS FULLY INFORMED ABT VSLS'S EXPECTED ITINERARY
AND COMPLETION CGOES FROM TIME OF NOMINATION OF THE PERFORMING
VSL. OWNERS WARRANTEE THE PROPER SEPARATION FROM OTHER COMBINATION
CGO AT THEIR ACCOUNT, RISK AND EXPENSE.
- FRT INVOICE TO BE ISSUED AND FAXED TO CHRTRS NOT LATER THAN 8 HRS
AFTER  S\R M\RS PROVIDED IT IS FOLLOWED BY WORKING DAY
- IN CASE OWNERS\OR THEIR AGENTS HAVE ANY DEBTS DUE PORT AUTHORITIES
OR ANY OTHER AUTHORITIES OR ANY OTHER PARTIES, CHRTRS ARE NOT
RESPONSIBLE
FOR ANY DELAY\DETENTION OR ANY CLAIMS \ LIEN DUE TO THIS REASON
- OWNERS CONFIRM AND GRTEE THE VESSEL IS IN ALL RESPECTS SUITABLE FOR
THE TRADE AND THE PORTS FIXED AND COMPLIES WITH ALL APPLICABLE
RESTRICTIONS
DURING THE PERIOD OF THIS CHARTER PARTY AND ACCEPTING ANY CONSEQENSES
AND\OR COSTS DIRECTLY RESULTING FROM ANY PROBLEMS AND\OR DELAYS.
- STEVEDORES , ALTHOUGH APPOINTED AND PAID BY SHPRS\CHRTRS SHALL LOAD,
STOW THE CGO IN ACORDANCE WITH MASTER'S INSTRUCTIONS AND SUPERVISION.
STEVEDORES DAMAGES, IF ANY, TO BE SETTLED DIRECLY BETWEEN OWNERS AND
STEVEDORES W\OUT CHRTRS INTERFERENCE.
IN CASE OWNERS ARE UNABLE TO GET SUCH SETTLEMENT, CHRTRS TO BY ALL
MEANS ASSIST IN GETTING THIS SETTLEMENT.AND REMAIN ULTIMATELY
RESPONSIBLE
- NAME AND FULL STYLE OF OWNER'S AGENT AT PORT OF DESTINATION SHOULD
BE NOMINATED AND ADVISED TO THE CHRTRS BEFORE LOADING.
- GCN C\P 94 LOGICALLY AMENDED WITH 2.5 ADD COM+1,25 TO SEAVENT MARITIME   1\2
-on the next booking chrtrs will pay usd 6.700,-- lumpsum
 on top of the agreed freight rate"

END


pls adv

BRGDS/JIM



# FORM No. 7–8

## GENCON[1]

### The Baltic and International Maritime Conference

### Uniform General Charter

### (*Revised 1994*)

> Part I of this charter party appears in a box layout which is illustrated on the following pages. Part II has been reprinted to permit presentation in a readable format designed to facilitate research.

---

[1] © The Baltic and International Maritime Conference; reprinted with permission.

Adopted by the Documentary Committee of the General Council of British Shipping, London and the Documentary Committee of the Japan Shipping Exchange, Inc., Tokyo.

Recommended by the Baltic and International Maritime Conference.

**RECOMMENDED**
**THE BALTIC AND INTERNATIONAL MARITIME COUNCIL**
**UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)**
(To be used for trades for which no specially approved form is in force)
CODE NAME: "GENCON"

Part I

| | |
|---|---|
| 1. Shipbroker | 2. Place and date |
| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
| 5. Vessel's name (Cl. 1) | 6. GT/NT (Cl. 1) |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
| 9. Expected ready to load (abt.) (Cl. 1) | |
| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1) | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |

(Matthew Bender & Co., Inc.)        (Rel.68—9/95 Pub.130)

15. State if vessel's cargo handling gear shall not be used (Cl. 5)

16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6)

17. Shippers/Place of business (Cl. 6)

(a) Laytime for loading

18. Agents (loading) (Cl. 6)

(b) Laytime for discharging

19. Agents (discharging) (Cl. 6)

(c) Total laytime for loading and discharging

20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)

21. Cancelling date (Cl. 9)

22. General Average to be adjusted at (Cl. 12)

23. Freight Tax (state if for the Owners' account (Cl. 13 (c))

24. Brokerage commission and to whom payable (Cl. 15)

25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)

(a) State maximum amount for small claims/shortened arbitration (Cl. 19)

26. Additional clauses covering special provisions, if agreed

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

Signature (Owners)

Signature (Charterers)

Printed and sold by Fr. G. Knudtzon Ltd., 55 Toldbodgade, DK-1253 Copenhagen K. Telefax +45 33 93 11 84 by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen

## PART II

**1.** It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:

The said vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

**2. Owners' Responsibility Clause.** The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.

And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

**3. Deviation Clause.** The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

**4. Payment of Freight. (a)** The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.

**(b) Prepaid.** If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.

Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.

**(c) On delivery.** If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before

breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.

Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

**5. Loading Discharging Costs. (a) Costs/Risks.** The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.

**(b) Cargo Handling Gear.** Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power—pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party—shall not count as laytime or time on demurrage.

On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.

**(c) Stevedore Damage.** The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.

The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any tiime lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

**6. Laytime. *(a) Separate laytime for loading and discharging.** The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.

(Matthew Bender & Co., Inc.)                    (Rel.68—9/95 Pub.130)

The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.

   *(b) Total laytime for loading and discharging. The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.

   (c) Commencement of laytime (loading and discharging). Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.

   If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.

   If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.

   Time used before commencement of laytime shall count.

   * Indicate alternative (a) or (b) as agreed, in Box 16.

   7. Demurrage. Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.

   In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

   8. Lien Clause. The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

   9. Cancelling Clause. (a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.

**(b)** Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.

The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

**10. Bills of Lading.** Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

**11. Both-to-Blame Collision Clause.** If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners.

The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**12. General Average and New Jason Clause.** General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).

If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any clause whatsoever, whether

due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

**13. Taxes and Dues Clause. (a) On Vessel.** The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.

**(b) On cargo.** The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.

**(c) On freight.** Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

**14. Agency.** In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

**15. Brokerage.** A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.

In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

**16. General Strike Clause. (a)** If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

**(b)** If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter

full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

**17. War Risks ("Voywar 1993"). (1)** For the purposes of this Clause, the words:

(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the ports or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or

continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at the any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:—

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any other way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

**(d)** to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

**(e)** to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

**(f)** where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

**(6)** If in compliance with any of the provisions of sub-classes (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

## 18. General Ice Clause.

### Port of loading.

**(a)** In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.

**(b)** If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.

**(c)** In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.

### Port of discharge.

**(a)** Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the reopening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.

**(b)** If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he

has on board and to proceed to the nearest accessible port where she can safely discharge.

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

**19. Law and Arbitration. *(a)** This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.

For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

***(b)** This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.

***(c)** Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.

**(d)** If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.

\* *(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.*

\*\* *Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.*

(Text continued on page 7–53)

(Matthew Bender & Co., Inc.)             (Rel.68—9/95 Pub.130)



# SASCO GmbH

**Hohe Bleichen 5, 20354, Hamburg, Germany**

Shipping+Transport

TO: DAVID FARRINGTON ESQ.
CHORLEY I ARM HOUSE
WES I WYCOMBE
BUCK NGHAMSIZE
HP144BS

CC: RAETS PANDI CLUB
ATTN: N R.F.DROOGE

DEAR MR.FARRINGTON,

RE: CAPT.G.TSANGARIS CP DD 25.11.2005/ STEVEDORE DAMMA GE AT ODESSA.

FURTHER TO YOUR FAX DATED 20/02/2007 ACTING AS SOLE ARBITRATOR FOR THE ABOVE CASE WE WOULD LIKE TO SUBMITT OUR POINT OF DEFFENCE AFTER READING CAREFULLY THE CLAIMANT, DESPONENT OWNERS MESSERS. MARTRADE SHIPPING AND TRANSPORT C MBH POINTS OF DEFFENCE DATED 18.12.2006.

A) STEVEDORES DAMAGES IF ANY TO BE SETTLEI DIRECTLY BETWEEN OWNERS AND STEVEDORES W/OUT CHARTERERS INTERFERANCE. IN CASE OWNERS ARE UNABLE TO GET SUCH SETTLEMENT, CHRTRS TO BY ALL MEANS ASSIST IN CETTING THIS SETTLEMENT AND REMAIN ULTIMATELY RESPONSI LE ' OWISE DETENTION TO APPLY AT THE RATE OF USD 35000 PD PI O RATA. THE LAST PARAGRAPH IS NOT MENTIONED ON THE STEVEDORE DAMMAGE CLAUSE. IT IS ONLY REFFERS TO THE DETENTION CLAUSE QUOTE:" CHRTRS TO G-TEE THAT ON VESSE I'S ARRIVAL SH/ORDERS FOR 100 PCT JEBEL ALI CARGO ARE ISSUEI / RELEASED AND DELIVERED TO THE STEVEDORES. CHRTRS TO G- EE THAT ON VESSEL'S ARRIVAL SH/ORDERS FOR 9000 MTS KARAC II CARGO TO BE ISSUED AND THE BALANCE SH/ORDERS UP TO FINA Q-TY TO BE ISSUED / RELEASED AND DELIVERED TO THE STEVED RES. MAX 30 HRS AFTER VESSEL'S ARRIVAL O/WISE DETENTION TO APPLY AT THE RATE OF USD 35000 PER DAY PRO RATA, MOREOVER DETENTION TO APPLY IN CASE OF ANY OTHER D LAY VSL IS SUFFERING IN VIEW OF MISSING CARGO DOCUMENTS.
IT IS QUITE CLEAR THAT NO DETENTION WAS MENTIOI IED FOR ANY DELAY CAUSED BY STEVEDORES DAMMAGE.

B) STEVEDORES CARRIED OUT THE REPAIR WORKS TO OWNERS SURVEYORS SATISFACTION AT THEIR OWN EXPENSES AFTER FIVE

MONTHS WE RECEIVED A CLAIM FROM CLAIMANTS MSSRS.MARTRADE FOR AN AMOUNT OF USD 145750 W/ OUT PROPER SUPPORTING DOCUMENTS. WE WOULD LIKE TO POINT OUT THAT THE VESSEL WAS WITH HEAD OWNERS FOR 12 MONTHS TIME CHARTER +/- 2 MONTHS AT RATE OF 18300 PER DAY APPROXIMATELY. CLAIMANTS WERE NOTIFIED ABOUT THE DAILY HIRE RATE AND CAME BACK WITH REVISED CLAIM OF USD 115955.53 W/OUT SUPPORTING DOCUMENTS. THE CLAIM WAS ADDRESSED TO SASCO GmbH UNDER INVOICE 743 DATED 31.12.2005.

THE INVOICE IS ON ENCLOSURE 6. WE REPUDIATE IN WRITING TO THEM THAT WE CAN'T ACCEPT SUCH CLAIM AS THEY MUST EXERCISE MAXIMUM ENDEVOUR FIRST WITH STEVEDORES IN ORDER TO TRY TO RECOVER THIS AMOUNT, AS PER RELEVANT STEVEDORING CLAUSE, AS PER STEVEDORES LETTER ADDRESSED TO THE CLAIMANT'S LAWYERS. LAW FIRM ANK ; ATTI. MR.KIFAK( SUCH CORRESPONDENCE ENCLOSED) WHICH WE TRUST TO FIND SELF EXPLANATORY. WE AS CHRTRS TRY TO ASSIST CLAIMANTS, WITH STEVEDORES, IN ORDER TO RECOVER THEIR CLAIM. STEVEDORES ( NOVOTECH) REJECTED THE CLAIM AS PER ATTACHED LETTER, AND ON THE GROUNDS THAT THEY DIDN'T EXCEED THE LAYTIME CALCULATED ACCORDING TO THE CODE OF THE PORTS TRADITIONS.

C). NOUMEROUS TALKS WERE CARRIED OUT BETWEEN CLAIMANTS LAWYERS AND DEFFENDENTS REGARDING THE FURTHER STEPS, WE CLEARLY STATED TO CLAIMANTS ON THEIR LETTER DATED 19 OF APRIL 2006 OUR POSITION ( PLEASE SEE BOTH LETTERS ATTACHED). THE NEXT LETTER WHICH WE RECEIVED FROM CLAIMANTS LAWYERS MSSRS.WINTER SCOTT WAS JUNE 19, 2006( PLEASE FIND SAME ENCLOSED).

D). DURING THE MONTHS OF JULY – AUGUST – SEPTEMBER – OCTOBER- NOVEMBER WE HAD NOT RECEIVE ANY FURTHER CORRESPONDENCE. WE WERE THEREFORE UNDER THE IMPRESSION THAT THE MATTER WAS EITHER SOLVED BETWEEN CLAIMANTS AND STEVEDORES, OR CLAIMANTS MSSRS.MARTRADE DIDN'T WANT TO PERSUE THE MATTER FURTHER WITH STEVEDORES, FOR COMMERCIAL REASONS, AND SINCE THEY LOAD 2-3 VESSELS PER MONTH FROM NOVOTECH TERMINAL AND DIDN'T WISH TO JEOPARDIZE THEIR RELATIONS WITH STEVEDORES. FURTHERMORE STEVEDORES ARE STATING THAT NEVER RECEIVED ANY NOTICES FROM CLAIMANTS FOR LEGAL PROCEEDINGS, AGAINST THEIR COMPANY.

WE TRUST THAT AFTER STUDYING ALL RELEVANT DOCUMENTS AND CORRESPONDENCE EXCHANGED BETWEEN ALL PARTIES IN ORDER THAT YOU WILL TAKE YOUR FINAL DECESION.

NO DOUBT THAT A LOT OF OTHER EVIDENCE THEY WILL BE NEEDED TO HAVE, BEFORE YOUR FINAL DECESION.

P.S. DUE TO THE REMOVAL LAST OCTOBER FROM OUR OLD OFFICE THE FILE OF MV C.G.TSANGARIS RELATING TO THIS CASE WAS LOST.
ALL CORRESPONDENCE IS IN THE HANDS OF CLAIMNTS, AND WINTER SCOTT WHICH ARE NOT SUBMITTED TO YOU.

ENCLOSURES : 8 PAGES(INCL.THIS)
TOMORROW ALL CORRESPONDENCE BETWEEN OWNERS , THEIR LAWYERS AND STEVEDORES WILL BE SENT TO YOU WITH RELEVANT DOCUMENTS ATTACHED.

SINCERELY YOURS
FOR AND ON BEHALF OF SASCO GmBH
MR.DIMITRIS NIKOLOULIAS
LIGAL DEPT.

Page 1 of 1

**Richard Verney**

From:     Kristina [office@ultratest.com.ua]
Sent:     21 April 2006 13:26
To:       Richard Verney
Subject:  c.george tsangaris

REF: CAPT.GEORGE TSANGARIS C/P DD 25/11/2005
     STEVEDORES DAMAGE AT ODESSA.

DEAR RICHARD,

THANK YOU VERY MUCH FOR YOUR KIND E-MAIL WHICH NOTED WITH INTEREST

FOR THE SHAKE OF GOOD ORDER I WOULD LIKE TO POINT OUT TO YOU THE FOLLOWING:

1)   WE INDEED ASSIST CHARTERERS TO REPAIR THE DAMMAGE SUSTAINED TO THE VESSEL
     BY THE STEVEDORES, AND SAME WAS DONE TO OWNERS SATISFACTION.

2)   AFTER THE REPAIRS WERE COMPLETED AND COUPLE OF MONTHS LATER WE RECEIVED AN
     E-MAIL BY MARTRADE WITH ATTACHMENT OF STEVEDORES ALLEGATIONS WHY THEY .
     REPUDIATED THE TIME LOST WHICH WAS BASED ON THE ARGUMENT, AND ACCORDING TO
     THEIR CALCULATIONS THAT UNDER CQD TERMS THE VESSEL WOULD .AVE LOADED IN
     MORE DAYS THAN SHE ACTUALLY LOADED (INCLUDING THE PERIOD OF REPAIRS).

3)   THE ULTIMATELY RESPONSIBLE NOT ALWAYS MEANS RESONABLY ENDEAVOURS, BUT
     ALSO ALL THE MEASURMENTS TO BE TAKEN AGAINST THE STEVEDORES.IN CASE THAT
     CHARTERER FAILED TO RECOVER THEIR CLAIM UNDER A COURT ORDER OR ARBITRATION
     AWARD, THEN WE CAN BE HELD ULTIMATELY RESPONSIBLE, BUT TO PAY A CLAIM WHICH IS
     DRAWN UP BY CHARTERERS AND NOT EVEN AGREED BY STEVEDORES IT IS RATHER
     ILLOGICAL AND NOBODY WOULD EVER PAY JUST WITH AN INVOICE PRESENTED TO THEM. I
     TRUST THAT YOU WILL AGREE WITH ME.

4)   I WOULD LIKE TO POINT OUT TO YOU AS WELL THAT SASCO IS NOT THE CONTRACTUAL
     PARTY WITH THE STEVEDORES, AND HAS NOTHING TO DO WITH THEM. THE PARTY THAT
     APPOINTS THE STEVEDORES ARE THE STEEL MILL FACTORIES SINCE ALL CARGOES ARE
     BOUGHT ON FOB BASIS WITH CQD TERMS OF LOADING. SASCO IS ONLY THE FREIGHT
     CONTRACTOR.

5)   THIS IS CLEARLY A THIRD PARTY LIABILITY CASE THAT'S WHY THE STEVEDORING
     CLAUSE CLEARLY STIPULATES STEVEDORE DAMAGES, IF ANY, TO BE SETTLED .................
     WITHOUT CHARTERERS INTERFERENCE ........ . IT SIMPLY MEANS AS A THIRD PARTY
     LIABILLITY CLAIM THAT OWNERS HAVE TO PROCEED AGAINST THE STEVEDORES
     DIRECTLY.

IN ORDER TO FINALIZE, THE ARGUMENT OF MARTRADE THAT BY PERSSUING LEGAL PROCEEDINGS
AGAINST STEVEDORES, THE ADVISE GIVEN TO THEM BY THEIR LAWYERS IN UKRAINE THAT SUCH
PROCCEDINGS WILL NOT SUCCEED IT IS ONLY AN ASSUMPTION (WHO DARES WINS !!!! WITHOUT
ENDEAVOURING ALL POSSIBLE WAYS OF RECOVERING WHAT MARTRADE IS CLAIMING AGAINST THE
STEVEDORES, NOBODY CAN PREDICT THE RESULTS IN ADVANCE.
SASCO WILL GIVE ALL ASSISTANCE TO MARTRADE IN ORDER TO SUCCEED FOR THE RECOVERY OF
THEIR CLAIM.
     TO CONCLUDE: I APPRECIATE YOU SUGGESTION AND CONSIDERE IT AS VITAL AND
IMPORTANT, THAT MARTRADE'S UKRAINIAN LAWYERS WILL DO ALL NEEDFULL AND PUT THEM ON
NOTICE AS PER YOUR SUGGESTION........
     REST ASSURE THAT WE WILL TRY ALL OUR BEST AND PERSONALLY I WILL TRY VERY HARD TO
SEE THE MATTER RESOLVED, BUT I ALSO NEED COPIBS OF ALL THE CORRESPONDANCE EXCHANGED SO
FAR BETWEEN STEVEDORES AND MARTRADE, THE RELEVANT REPORTS, IN OTHER WORDS THE
COMPLETE FILE.
I,M WAITING TO HEAR THAT ABOVE STEPS WILL BE TAKEN BY THE LAWYERS OF MARTRADE IN
ODESSA. I LOOK FORWARD TO HEAR FROM YOU.

WITH WARM WISHES
DIMITRIS NIKOLOULIAS
FOR AND ON BEHALF OF SASCO

P.S. TODAY IS GOOD FRIDAY HERE AND WE ARE WORKING ALSO EASTER MONDAY.



21/04/2006

*Cp George Tsangaris*                                    Page 1 of 2

**Richard Verney**

| | |
|---|---|
| **From:** | Richard Verney |
| **Sent:** | 19 April 2006 15:53 |
| **To:** | 'seavent@otenet.gr' |
| **Subject:** | Capt George Tsangaris |
| **Importance:** | High |

To: Sasco Gmbh
Attn: Claim Department
c/o: Seavent Maritme
Fm: Winter Scott

Date 19th April 2006

Re: Capt George Tsangaris c/p dd 25/11/05 – stevedore damage at Odessa

*PLEASE PASS THIS MESSAGE PROMPTLY ONTO SASCO GMBH AND PLEASE CONFIRM TO US THAT THIS MESSAGE HAS BEEN PASSED ONTO SASCO GMBH.*

*URGENT PROMT ATTENTION REQUIRED*

We are London Solicitors instructed on behalf of Martrade Shipping & Transport GmbH in connection with the dispute under the above Charterparty.

We have read the exchanges between the parties regarding the stevedore damage sustained by the vessel and you are accordingly familiar with this matter.

We fail to understand how you can reject liability given your own letter of 13th December 2005 (addressed To Whom it May Concern) in which you acknowledge that the damage was caused by the negligence of the stevedores and given Clause 38 of the Charterparty in which it is clearly set out that you as Charterers to remain ultimately responsible for stevedore damage.

Our clients have repeatedly tried to convince the stevedores to pay for the damage but regrettably our clients have not been fully successful (we understand that Stevedores have paid for the physical repair but not the time lost during the repairs). Pursuant to the terms of the charter, you are obliged to recompense our clients for this loss.

Please be advised that, on behalf of Martrade, we have today appointed Mr Carrington of Chorley Farm House, West Wycombe, Buckinghamshire HP14 4BS to act as arbitrator in connection with the stevedore damage claim We hereby call upon you to appoint your arbitrator, within the next 14 days and to notify us within those 14 days of the arbitrator appointed by you. Please be advised that should you fail to appoint an arbitrator and/or fail to notify us of the arbitrator appointed by you within the 14r day period, we shall take steps to have the Arbitration Tribunal appointed by way of default.

We look forward to hearing from you within the next 14 days.

Best regards
Richard Verney
Winter Scott

(1)

19/04/2006

## Richard Verney

| | |
|---|---|
| **From:** | Richard Verney |
| **Sent:** | 19 June 2006 20:38 |
| **To:** | 'Kristina' |
| **Subject:** | Capt George Tsangaris |
| **Importance:** | High |
| **Attachments:** | _0619203039_001.pdf |

Dear Dimitris

I write further to previous communications.

Martrade have had further contact with the Stevedores and (as requested by you), their Ukrainian lawyer has taken matters up with them. I attach copies of exchanges.

You will note from the attached that the matter has not been resolved nor realistic settlement proposal put. It is now up to you to see whether you can persuade the stevedores to properly settle the loss sustained by Martrade. To this end, Martrade are prepared to give you/Charterers this opportunity.

Unless your approach leads to some positive developments by the end of the 28th June, our instructions are to proceed with the arbitration

I look forward to hearing from you.

Best regards
Richard Verney
Winter Scott



19/06/2006

**Kristina**

| | |
|---|---|
| From: | Richard Verney [rverney@winterscott.co.uk] |
| Sent: | Monday, June 19, 2006 10:38 PM |
| To: | Kristina |
| Subject: | Capt George Tsangaris |
| Importance: | High |
| Attachments: | _0619203039_001.pdf |

Dear Dimitris

I write further to previous communications.

Martrade have had further contact with the Stevedores and (as requested by you), their Ukranian lawyer has taken matters up with them. I attach copies of exchanges.

You will note from the attached that the matter has not been resolved nor realistic settlement proposal put. It is now up to you to see whether you can persuade the stevedores to properly settle the loss sustained by Martrade. To this end, Martrade are prepared to give you/Charterers this opportunity.

Unless your approach leads to some positive developments by the end of the 28th June, our instructions are to proceed with the arbitration

I look forward to hearing from you.

Best regards
Richard Verney
Winter Scott

Attn. of Mr. Kifak A.N
Director of law firm "ANK

*Dear Alexander Nikolaevich!*

In reply to your letter with the reference number 3810/CA dd. 12.05.2006, we keep you informed, that the fuel tank of the m/v "Captain George Tsangaris" was really damaged by the workers of the line team of the LLC "NT'" while the loading of the billet on 12.12.2005 at 09:30. As far as you know, the repair works were efficiently executed by our company, connecting with the caused damages to the vessel. All the costs, connecting with the elimination of the consequences of the damage, and also the services of the Lloyd surveyor were paid in the whole volume by our company.

After the expiration of five months, we received your claim-letter concerning the compensation of the damages in the amount of 145750,53 US dollars by our company to your client, which are supposedly connected with the demurrage of the vessel. But any calculated materials do not support the given claim.

We do not consider ourselves to be responsible for the demurrage of the vessel, as we did not exceed the lay time, calculated according to the Code of the port's traditions.

At the same time, if you provide the calculated proves, grounding the claims, pointed in your letter, we are ready to examine the given matter within the frames of the discussion process taking into account our long-term and mutually beneficial collaboration with the company "Martrade Shipping + Transport GmbH".

Truly yours,

**General director**                                              Stashkevich *O.G.*

* 13    NT OFFICE        Mау.12  3:40PM  01'14    TX    01    (<              (00

# ЮРИДИЧЕСКАЯ КОНСУЛЬТАЦИЯ

Юридические услуги
Адвокатская практика

ул. Ланжероновская, 9
г. Одесса, 65026, Украина
Тел/факс: (0482) 348-716 (5 линий)

E-mail: office@ank.odessa.ua
www.ank.odessa.ua

| | |
|---|---|
| **Дата:** | **12 мая 2006г.** |
| **Исх. №** | **3810/СА** |
| **Компания:** | «Новотех-Терминал» |
| **Тема:** | т/х «Captain George Tsangaris»/ демерредж по вине стивидора |

Уважаемые господа!

Мы представляем интересы компании «Martrade Shipping+Transport GmdH».

Наш клиент уполномочил нас обратиться к Вам с настоящим письмом, поскольку имеет к Вашей компании денежное требование на сумму 145 750 долларов США 53 цента.

12 декабря 2005 года во время погрузки на Вашем терминале был поврежден топливный танк № 4 судна «Captain George Tsangaris». Причиной повреждения стало падение связки стальной заготовки в трюм. Вследствие данного повреждения судно вынуждено было покинуть Одесский порт не 12 декабря 2005 года, в соответствии с расчетом сталийного времени, а 19 декабря 2005 года, то есть на семь дней позднее.

Несмотря на то, что Вы возместили прямые расходы на ремонт судна, наш клиент понес значительные убытки, вызванные семидневной задержкой в отправлении судна. По оценке нашего клиента величина убытков составляет 145 750 долларов США 53 цента.

Поскольку ущерб судну причинен по вине Вашей компании, Ваша компания является ответственной и за прямые убытки, и за демерредж.

От имени нашего клиента, компании «Martrade Shipping+Transport GmdH», предлагаем Вам исполнить денежное обязательство по возмещении убытков, причиненных простоем судна (демерредж).

Просим Вас принять во внимание, что Ваш отказ от выполнения денежного обязательства неизменно повлияет на дальнейшие взаимоотношения с компанией «Martrade Shipping+Transport GmdH», а также предъявление к Вам иска, цена которого может значительно превысить сумму демерреджа, поскольку будет включать судебные издержки и расходы на оплату юридических услуг.

С уважением,

\

Адвокат                              _(подпись)_    /Кифа А.Н./

1

ООО "НОВОТЕХ-ТЕРМИНАЛ"



NOVOTECH-TERMINAL LIMITED

Исх № 328
24.05.2006 г.

Директору компании «АНК»
г-ну Кифак А.Н.

**Уважаемый Александр Николаевич!**

На Ваш исх. № 3810/са от 12.05.2006 г. сообщаем, что действительно работниками линейной бригады ООО «НТТ», при погрузке з готовки, 12.12.2005 г. в 09.30 был повреждён топливный танк т/х "Captain George Tsangaris". Как Вам известно, нашей компанией были оперативно выполнены ремонтные работы, связанные с нанесёнными судну повреждениями. Все расходы, связанные с устранением последствий повреждения, а также услуги Илойдовского сюрвейера в полном объёме были оплачены нашей компанией.

По прошествии пяти месяцев, нами получено от Вас письмо с претензией по возмещению вашей компанией Вашему клиенту убытков в размере 145750,53 долларов США, якобы связанных с простоем судна. Однако, данная претензия никакими расчётными материалами не подкреплена.

Также не считаем себя ответственными за простой судна, поскольку за рамки сталийного времени, рассчитанного согласно Свода обычаев порта, мы не вышли.

Вместе с тем, если Вами будут предоставлены расчётные доказательства, обосновывающие требования, указанные в Вашем письме, мы готовы с учётом нашего долгосрочного и взаимовыгодного сотрудничества с компанией "Martrade Shipping-Transport GmbH" рассмотреть данный вопрос в рамках переговорного процесса.

С уважением,

Генеральный директор                                              Сташкевич О.Г.

**Dmitri**

| | |
|---|---|
| **От:** | Dmitri [office@sascogmbh.de] |
| **Отправлено:** | Friday, March 02, 2007 4:59 PM |
| **Кому:** | 'df@chlorleyfarm.co.uk' |
| **Тема:** | lay time calculation mv George Tsangaris |
| **Вложения:** | Lay time calculation mv George Tsangaris.pdf |

Dear all

Please find attached.

SASCO GMBH
Best Regards.
Dimitri Nikoloulias

# SASCO GmbH
### Hohe Bleichen 5, 20354, Hamburg, Germany



**S ipping+Transport**

Dear All.

Further to our points of deffence submitted to David Farrington esq 28/02 2007 and 1st of March, we attach stevedores calculation which we received explaining their lay ti ne calculation. Some is in Russian language but it would be better if you translate officialy.

Kind Regards
Dimitri Nikoloulias.                                    02/03/2007

## Расчёт сталийного времени по т/х "Captain George Tsangaris"

Расчёт сталийного времени по указанному судну производится в соответствии со Сводом обычаев Одесского порта (СОП), а именно:
- п. 2.1.3. СОП регламентирует порядок и условия обработки и обслуживания находящихся в порту судов, грузов и пассажиров;
- п. 3.1.1. СОП применяется в случаях отсутствия договора морской перевозки.

Счёт сталийного времени по т/х "Captain George Tsangaris", как линейного судна, начинается согласно ст. 18.1. СОП с момента прихода судна в порт, то есть с 11.0 07.12.2005 г. (согласно таймшита судно стало на якорь и подало нотис о готовности).

На основании ст. 18.7. СОП сталийное время по судам на которых производится погрузка грузов двух и более наименований, для которых установлены разные валовые нормы (ВН), то сталийное время рассчитывается как сумма времени, определённого для перегрузки каждого груза по установленной для него ВН. Наша компания производила погрузку на т/х "Captain George Tsangaris" следующие грузы (таблица 1)

таблица 1

| Наименование груза | Количество груза, тн | Экспедитор |
|---|---|---|
| Катанка | 4954,80 | Вара |
| Заготовка в пачках | 5360,70 | Каргоимпекс |
| Заготовка штучная | 7988,95 | Каргоимпекс |
| *Итого* | *18304,45* | |

Согласно ст. 18.9. СОП при подаче в порт судна, предъявляющего согласно каргоплану к погрузке груз не на всё количество трюмов, ВН снижается пропорционально отношению количества предъявленных трюмов ко всему количеству трюмов, то есть для обработки грузов, которые должна была погрузить наша компания, было предъявлено 4 трюма, при этом поправочный коэффициент к ВН составляет 0,57. Данные о ВН и сталийном времени приведены в таблице 2.

таблица 2

| Наименование груза | Количество груза, тн | Экспедитор | Валовые нормы (2004 г), тн/сут | ВН с учётом п. 18.9 СОП, тн/сут | Сталийное время по ВН, сут |
|---|---|---|---|---|---|
| Катанка | 4954,80 | Вара | 1000 | 570 | 8,69 |
| Заготовка в пачках | 5360,70 | Каргоимпекс | 2500 | 1425 | 3,76 |
| Заготовка штучная | 7988,95 | Каргоимпекс | 1000 | 570 | 14,02 |
| *Итого* | *18304,45* | | | | *26,47* |

К сталийному времени (табл. 2) необходимо прибавить время (ст. 18 5.1. СОП), связанное с неблагоприятными метеорологическими условиями, согласно таймшиту это время составляет 9 часов (0,38 сут).

В соответствии со статьёй 18.1.2. СОП из сталийного времени исключаются выходные дни, начиная с пятницы 17.30 до понедельника 08.30, то есть 63 часа (2,63 сут).

Итого сталийное время по т/х "Captain George Tsangaris" составляет 26,47 сут + 0,38 сут + 2,63 сут = 29,48 сут.

С учётом того, что указанное судно бросило якорь в 11.00 07.12.2005 г., то его обработка по СОП должна была быть закончена ООО "НТТ" 05.01.2006 г. в 23.00.

Учитывая тот факт, что судно снялось в рейс 19.12.2005 г. в 01.40, таким образом экономия сталийного времени для судовладельца составила 17 суток и 21 час.

Расчёт произвёл        Семушев Вячеслав

Расчёт проверил        тел. 8 050 3950337

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:



MARTRADE SHIPPING & TRANSPORT GmbH of Dusseldorf

Claimants (Disponent Owners)

and

SASCO GmbH of Hamburg

Respondents (Charterers)

"Capt. George Tsangaris"; charterparty dated 25th November 2005

----------------------------
**FIRST FINAL AWARD**
----------------------------

WHEREAS

1. By a charterparty on an amended Gencon 1994 Box Layout form dated 25th
November 2005 ("the charterparty) it was agreed between Martrade Shipping &
Chartering GmbH as Disponent Owners ("the Claimants") and Sasco GmbH as
Charterers ("the Respondents") that the Claimants' vessel "Capt George
Tsangaris" ("the vessel") would proceed to Odessa and there load a part cargo of
steel billets for carriage to and discharge at Karachi.

2. The charterparty provided for arbitration in London with English law to apply.
On 2nd May 2006 the Claimants appointed me, David Farrington, of Chorley
Farm House, West Wycombe, Buckinghamshire HP14 4BS to act as Arbitrator. I

EXHIBIT 1

am a Full Member of the London Maritime Arbitrators Association and a Member of the Baltic Exchange. The Claimants' solicitors, Winter Scott of London, on 19th April 2006 through brokers gave to the Respondents formal notice of my appointment as Arbitrator and called upon the Respondents to appoint an Arbitrator. The brokers confirmed that the formal notice had been forwarded to the Respondents. The Respondents failed to appoint an Arbitrator. Accordingly, on 2nd December 2006 I accepted appointment as Sole Arbitrator pursuant to section 17(2) of the Arbitration Act 1996. The seat of this arbitration is England.

3. The dispute referred to me as Arbitrator was a claim by the Claimants against the Respondents for damages for detention in the sum of US$115,955.53 which, said the Claimants, had been incurred at Odessa. The detention of the vessel arose from a delayed departure which was caused by the need to effect repairs to the vessel because she had been damaged by the failure or negligence of stevedores during loading operations. The Claimants also sought payment of interest and costs. The Respondents made written submissions in which they denied liability. They said that the Claimants' obligation under the charterparty was to use maximum efforts to recover direct from the stevedores. The Respondents also alleged delay by the Claimants in making the claim.

4. Both parties have seen the other's written submissions and the documents attached thereto. They have been given an opportunity of replying to those submissions and documents. My Reasons are attached to this First Final Award and form part of it.

NOW I, DAVID FARRINGTON, having taken upon myself the burden of this reference and having carefully and conscientiously considered the evidence and submissions of the parties, DO MAKE AND PUBLISH THIS MY FIRST FINAL AWARD as follows:

(A) **I HOLD AND FIND** that the claim succeeds in the amount of US$88,802.08 and no more.

(B) **I AWARD AND ADJUDGE** that the Respondents shall pay immediately to the Claimants the sum of US$88,802.08 (Eighty Eight Thousand Eight Hundred and Two United States Dollars and Eight Cents) together with interest thereon at the annual rate of 8.25% compounded every three months from 31st December 2005 until payment.

(C) **I FURTHER AWARD AND ADJUDGE** that the Respondents will pay the recoverable costs of the Claimants to be assessed if not agreed on the standard basis. I reserve to myself jurisdiction to assess those costs.

(D) **I FURTHER AWARD AND ADJUDGE** that the Respondents do bear and pay the costs of this First Final Award which **I HEREBY FIX** at £2,100.00 including interlocutory fees, always provided that if the Claimants have in the first instance paid any sum in respect of the costs of this First Final Award they shall be entitled to immediate reimbursement from the Respondents for the sum so paid together with interest on that sum from the date of payment by the Claimants at the rate of 8.75% per annum compounded every three months until the date of reimbursement by the Respondents.

GIVEN under my hand this 14 day of September 2007

..................................                    ..................................
David Farrington                                          Witness

3

mv "Capt George Tsangaris"

Charterparty 25th November 2005

REASONS FOR AND FORMING PART OF THE FIRST FINAL AWARD

1.    This First Final Award arises out of a voyage charter on an amended Gencon
      1994 Box Layout form dated 25th November 2005.   There is a claim by
      Disponent Owners against Voyage Charterers for damages for detention in the
      amount of US$115,955.53 plus interest and costs. The Respondents contest
      both liability and quantum.

2.    The claim arises in the following way. The charterparty provided for freight of
      US$43.00 per tonne Free In. It also provided:

      *"cargo to be loaded/dunnage/stowed/lashed/secured by Shippers stevedores
      free of expense to the vessel."*

      On 12th December 2005, whilst the part cargo of steel billets was being loaded
      in Odessa, a bundle was dropped by the stevedores. The result was damage to
      and a puncture of the port-side tank top in no 7 Hold, and damage to no 4 fuel
      oil tank ("the physical damage"). The vessel completed loading of the
      Respondents' cargo on the same day. Loading of other cargo was completed at
      17.30 hours on 15th December. The vessel was then scheduled to sail.

3.   However, before the vessel could sail the physical damage had to be repaired. The stevedores arranged and paid for the repairs to be effected. The repairs were completed at 23.00 on 18th December. The vessel was cleared outwards by the Odessa authorities at 01.00 on 19th December and actually sailed at 01.40 the same day.

4.   The Claimants say that the vessel was detained by reason of the physical damage and consequent repairs from 20.00 on 14th December until 01.40 on 19th December, a period of 4.24 days. They say that the vessel was detained as a result of a breach of charterparty by the Respondents or someone for whom they were responsible (in this case, the shippers' stevedores). The Claimants, therefore, seek damages for detention. The damages are claimed at two rates. For the period up to 15th December at the rate of US$35,000 per day in accordance with the charterparty rate of demurrage; thereafter at the rate of US$27,500 per day which (according to the Claimants) is the daily rate of hire and expenses which the Claimants were paying in their capacity as time charterers under the head time charter.

5.   There was a dispute between the parties over whether the charterparty contained the following provision as a separate paragraph:

"owise detention to apply at the rate of US$35,000 – day/rata..."

5

That was a provision upon which the Claimants relied. The parties were agreed that the charterparty contained the following words:

*"Stevedores damages, if any, to be settled directly between owners and stevedores w/out chrts interference. In case owners are unable to get such settlement, chrts to by all means assist in getting this settlement and remain ultimately responsible."*

For reasons which will become apparent, I do not consider that it is necessary for me to decide whether the first words quoted in this paragraph were actually part of the charterparty. As appears from the second quotation the parties are agreed that if the Claimants were unable to obtain settlement of the stevedore damages, the Respondents were to remain ultimately responsible.

6.    The Respondents said, however, that the absence from the charterparty of detention provisions meant that they had no liability for the delay caused whilst the physical damage were being repaired. They, therefore, wished to confine the meaning of the words "stevedore damages" to the physical damage. In certain circumstances it is true that the absence of a contractual provision can be determinative of parties' rights and obligations, but it does not necessarily follow that such an absence means that a party is relieved from liability. In this reference there can be little doubt that the loading (free in terms) was at the risk and expense of the Respondents. In breach of

6

charterparty the physical damage was caused by the admitted failure or negligence of the stevedores. I can see no need to construe the meaning of the words "stevedore damages" so that they only relate to the physical damage. It is obvious that there will be occasions (such as occurred at Odessa) when the physical damage is such as to require immediate repair which could delay either further operations on the vessel or a departure. It would be quite illogical if an owner was expected to bear the cost of delay without the opportunity to seek recompense elsewhere. Indeed, such an outcome would be inconsistent with a charterparty regime which imposes the expense and risk of loading upon charterers.

7.      Two types of damage were caused by that failure or negligence. First, the physical damage was caused. That damage was repaired by and paid for by the stevedores. There is, therefore, no claim in respect of it. Second, there are the financial damages which in this reference have been limited to the time for which the vessel was delayed whilst the physical damages were repaired. In short, a claim for damages for detention. The Respondents do not dispute that the vessel's departure was delayed because of the need for the vessel to be repaired. I, therefore, find that the vessel was delayed because of that need.

8.      Time sheets and a Statement of Facts were in evidence. It is clear that loading of other cargo was not completed until 17.30 on 15th December. I consider that the delay commenced at that point of time, and not at 20.00 on 14th February,

7

for which the Claimants contended. The repairs were complete at 23.00 on 18th December. I consider that to be the point in time when the delay ceased. The vessel was, therefore, detained for 3 days 5 hours and 30 minutes. The period between 23.00 on 18th December and 01.40 on 19th December was occupied by the normal operations of obtaining port clearance – operations which would in any event have had to have been undertaken if the vessel had been able to sail on a previous day.

9.    The Respondents submit that they are not liable because the Claimants were under an obligation to exercise "maximum endeavour" to recover from the stevedores all amounts due. Unfortunately for the Respondents, there are no such words in the relevant clause. In fact the clause required the Respondents "to by all means assist" the Claimants. So, if anything, the maximum endeavour was required on the part of the Respondents – a commercially sound approach in the context of a loading which was undertaken at their risk and expense. The evidence was that there were numerous discussions between the parties and that neither the Claimants nor the Respondents were able to make progress with the stevedores on the question of compensation for the delay in sailing. The Respondents say that they can do no more despite what they describe as their efforts to assist the Claimants in every way.

10.    I am satisfied on the evidence that the Respondents have used all means they can to assist the Claimants. However, the use of those means did not discharge

the Respondents from liability because, as the words of the clause state, the Respondents remain liable. Those words can only mean that if the Claimants were not successful in effecting a recovery from the stevedores, then the Respondents would pay. Such a construction makes sense in the context of a charterparty on free in terms.

11.    The other ground of defence relied upon is an allegation that the Claimants delayed for five months before presenting the claim for damages for detention. Even if the Claimants had delayed (and I find that they did not because an invoice was sent to the Respondents on 31st December 2005), delay in itself is not a ground of defence. In any event, if the Claimants were trying to obtain recompense direct from the stevedores, then some delay was inevitable

12.    I have found in paragraph 8 above that the vessel was delayed for 3 days 5 hours and 30 minutes. Damages for detention are to be calculated by reference to the market rate of the vessel. In the absence of evidence as to the market rate, it is permissible to use the rate of demurrage or hire given in a charter – see The Timna [1971] 2 Lloyd's Rep. 91. Although the demurrage rate was US$35,000 per day, the Claimants only seek that rate for the period of 19 hours 30 minutes preceding 17.30 on 15th December. I have, however, declined to include those 19 hours 30 minutes in the detention claim. For time after 17.30 on 15th December the Claimants seek to recover at the lower rate of US$27,500 which they say as time charterers they were paying to the

9

registered owners. The relevant time charter was in evidence. For the period between 17.30 on 15th December and 23.00 on 18th December I allow damages at the rate of US$27,500 per day or pro rata. The amount awarded is US$88,802.08. I have awarded interest at a rate and in a manner which is consistent with the practice in London maritime arbitration.

13.   The Claimants have been successful in this arbitration reference and are, therefore, entitled to their recoverable costs to the standard basis. I reserve to myself power to assess those costs. It is also appropriate that the Respondents should pay the fees on the First Final Award and, if those fees have been paid by the Claimants, then to make immediate reimbursement to the Claimants of that payment.

......................................